IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CIMAREX ENERGY CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-11-525-D |
| | ) | |
| SCOTT W. CALHOON, M.D., | ) | (Consolidated with |
| | ) | Case No. CIV-11-725-D) |
| Defendant/Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| QEP ENERGY COMPANY, | ) | |
| | ) | |
| Additional Counterclaim Defendant. | ) | |

**O R D E R**

Before the Court is the Motion of Cimarex Energy Co. ("Cimarex") and QEP Energy

Company ("QEP") for Summary Judgment [Doc. No. 47], filed pursuant to Fed. R. Civ. P. 56 and

LCvR56.1.  Scott W. Calhoon ("Calhoon") has timely responded to the Motion, and the movants

have replied.  Thus, the Motion is fully briefed and at issue.

**Factual and Procedural History**

This consolidated action concerns the validity of an oil and gas lease dated August 20, 1975

(the "Lease") under which Calhoon is a successor lessor and royalty interest owner, and Cimarex

and QEP are successor lessees and working interest owners.  It began as two separate cases:

*Cimarex Energy Co. v. Calhoon*, Case No. CIV-11-525-D, an original action in which Cimarex

sought a declaratory judgment that the Lease remains in effect; and *Calhoon v. Cimarex Energy

Corp.*, Case No. CIV-11-725-D, a removed action in which Calhoon sought a declaratory judgment

against Cimarex and QEP that the Lease terminated by its terms due to insufficient production.

These related actions were consolidated on September 6, 2011, and have proceeded under the lower-

numbered case, with Calhoon's pleading treated as counterclaims against Cimarex and QEP.[1] Cimarex and QEP now seek a declaratory judgment in their favor as a matter of law on the ground that, regardless of any question concerning production, Calhoon ratified the Lease after its alleged expiration by executing a division order regarding an oil and gas well completed within the leased acreage, and accepting royalty payments according to his leasehold interest.

## Standard of Decision

Summary judgment is proper "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.*

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* Fed. R. Civ. P. 56(c)(1)(A). A district court has discretion to go beyond the cited materials and consider other materials in the record, but it is not required to do so. *See Adler*, 144 F.3d at 672; Fed. R. Civ.

---

[1] In his original state-court petition, Calhoon also asserted claims for tortious breach of the duty of good faith and fair dealing and punitive damages. These claims were dismissed pursuant to Fed. R. Civ. P. 12(b)(6) by Order of April 19, 2012.

P. 56(c)(3). The court's inquiry is whether the facts and evidence of record present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### Statement of Undisputed Facts

The Lease covers approximately 152.83 acres of land in Canadian County, Oklahoma, located in Section 10, Township 13 North, Range 8 West of the Indian Meridian. Calhoon acquired mineral interests in the land in June, 1999; he owns no other mineral interests within Section 10. The Lease contains a habendum clause that provides for it to remain in effect beyond the primary term as long as oil or gas is produced by the lessee or the Lease is otherwise maintained. The Lease states it will not terminate if the lessee commences operations for additional drilling or reworking within 60 days after all oil or gas wells on the land become incapable of production.

The leased acreage lies within the "Enlow Unit," which has contained a number of wells at various times. Production ceased from the Enlow #1-10 well in October, 2000. Production began from the Enlow #10-2 well in November, 2000, and ceased in June, 2002. Production from the Enlow #3-10 (or #10-3) well commenced in July, 2002. The disputed time period regarding sufficient production is the period from November, 2000, to June, 2002, when the Enlow #10-2 was the only active well.

At some point after production began from the Enlow #3-10 (although the exact date is not known), Calhoon signed a division order presented by the operator, Castelli Exploration, Inc., for the distribution of oil or gas proceeds. The purpose of a division order is to obtain agreement regarding the share to be received by each party owning an interest in production from a particular well. By the terms of the document signed by Calhoon and his wife, they "certify and guarantee that [they] are the legal owners of and hereby warrant the title to our respective interests as set out below

3

in the proceeds derived from the sale of oil and/or gas from the [Enlow #3-10] well." *See* Mot. Summ. J., Ex. 8 [Doc. No. 47-8] at 1. The interest was identified as ".03125 RI" or royalty interest. *Id*. This fractional interest is the same as Calhoon would have received under the Lease. The division order also contains agreements regarding payments of proceeds, adverse claims of title, and transfers of interest, and states it became "valid and binding on each and every owner named herein as soon as signed by such owner . . . ." *Id*. at 2. In the paragraph regarding adverse claims or title issues, the document also states: "The undersigned hereby adopt, ratify, and confirm each oil and/or gas lease, together with any amendments thereto, under which the oil and/or gas to which Division Order applies is or is purported to be, produced." *Id*. at 1.

When Calhoon first obtained title to his mineral interests in Section 10, he was informed of the Lease and the existence of a producing well.[2] Cahoon did not investigate the status of the well at that time or at any time before signing the division order for the Enlow #3-10 well. Calhoon has testified that he had questions about the validity of the Lease when he signed the division order, and that he did not receive any royalty payments for production from the Enlow #10-2 well.

Calhoon accepted royalty payments for the sale of production from the Enlow #3-10 well beginning in 2003 and continuing through the date of his deposition on January 10, 2013. Until 2007, Calhoon was a practicing physician; since retiring, he has become actively involved in owning various oil and gas interests, primarily royalty interests and non-operating working interests. In 2007, Calhoon began talking to lease brokers about potentially leasing his mineral interests in Section 10. Through these discussions, Calhoon learned of interest in the exploration and development of a promising deep reservoir, known as the Woodford shale, and a degree of interest

---

[2] The quit claim deed conveying mineral interests to Calhoon and his wife is dated March 23, 2000, but it is unclear when Calhoon received it.

that had led some lessees to offer much higher royalty rates than reflected in the Lease.  After these discussions, Calhoon began to research the production history of the Enlow #10-2 well.  The movants acquired their interests in the Lease in 2008.

**The Movants' Position**

The movants argue two propositions that they assert entitle them to judgment as a matter of law:  1) Calhoon's execution of the division order effected a contractual ratification of the Lease; and 2) this ratification, together with Calhoon's acceptance of royalty payments from the sale of production, operates as a waiver of his claim of invalidity of the Lease and estops Calhoon from denying the lessees' title.

**Discussion**

**A.      Ratification**

The movants' position regarding ratification rests solely on the Oklahoma Supreme Court's decision in *Hull v. Sun Refining and Marketing Co.*, 789 P.2d 1272 (Okla. 1989).  The principle of ratification was not addressed in the opinion, and the holding of the case concerned the effect of a state statute regarding royalty payments.  However, the movants rely on a discussion in the opinion of "a recognized custom and usage of the oil and gas industry," which has become part of the common law, that "included a requirement that royalty owners execute division orders before receiving royalty payments."  *Id*. at 1278.  The supreme court summarized the common law principles, as they existed before enactment of the statute, as follows:

> Division orders are contracts between the sellers of production and the purchaser executed primarily to protect the purchaser.  Although division orders do not alter lease provisions, they are revocable authorizations to pay binding upon royalty owners until revoked.  Therefore, when a royalty owner executes a division order, the owner is bound by provisions of the division order which may abrogate or alter rights under the lease.

5

*Id*. at 1279.  Applying contractual principles to the division order signed by Calhoon, the movants argue that the terms of Calhoon's contract with Castelli Exploration, Inc. prevents Calhoon from now claiming that the Lease had expired before he signed the division order.  *See* Rely Br. [Doc. No. 66] at 7.

The Court is not convinced that *Hull* stands for the proposition asserted.  Although  the Oklahoma Supreme Court stated in *Hull* that a division order may alter or abrogate a royalty owner's rights under a lease, the court did not address the situation presented in this case, where the Lease allegedly expired by its own terms but was purportedly extended by subsequent ratification.  Further, the movants were not parties to the division order signed by Calhoon, and make no showing that they are entitled to benefit from it.  Therefore, the Court is not persuaded that Calhoon's alleged ratification of the Lease is enforceable by the movants against him, in order to extend the Lease in a manner allegedly inconsistent with its express terms.

For these reasons, the Court finds that the movants have failed to demonstrate they are entitled to a judgment as a matter of law on the ground of ratification of the Lease.

**B.     Ratification Plus Acceptance of Royalty Payments** [3]

The movants' additional proposition – that Calhoon waived his claim or is estopped from claiming the Lease had expired – is based solely on *Durkee v. Hazan*, 452 P.2d 803 (Okla. 1968).  In that case, a lessor sought cancellation of two leases that had been materially altered to avoid a clause requiring commencement of production by a certain date, and cancellation of a third lease covering the same tract of land because royalty payments were mistakenly paid to interest owners

---

[3] The movants concede that acceptance of royalty payments alone does not preclude Calhoon's lease termination claim.  *See* Reply Br. [Doc. No. 66] at 12; *see also Danne v. Texaco Explor. & Prod., Inc.*, 883 P.2d 210, 215 (Okla. Civ. App. 1994).

in an adjoining tract.  The Oklahoma Supreme Court rejected the lessor's claim that the leases should be cancelled, reasoning as follows:

> If it be conceded the two original leases were materially altered, any right to insist on invalidity was waived by execution of division orders and acceptance of royalties under the [third] lease.  A long recognized rule is to the effect that acquiescence in a lease and acceptance of royalty constitutes waiver of any objection the lessor could have taken regarding alteration and estops the lessor from denying the lessee's title.  Because [the lessor's] conduct clearly disclosed waiver of objection to the earlier transactions, it is unnecessary to consider related questions of ratification or confirmation of the lessee's acts and conduct by the [lessor].

*Id.* at 812-13.  The movants contend Calhoon is similarly situated to the lessor in *Durkee* in that both executed division orders and accepted royalty payments after the circumstances underlying a claim of invalidity had arisen.  The movants argue the outcome of *Durkee* hinged solely on the execution of a division order and receipt of royalty payments, and not on the lessor's intentional waiver of a known right or grounds for equitable estoppel.

The Court is not persuaded by the movants' argument that *Durkee* is controlling.  The facts of that case are distinguishable, and its holding does not stand for the broad proposition asserted. The lessor in *Durkee* did not seek cancellation based solely on the alteration of the original leases; the third lease was executed before drilling operations on the leased property began, and remained in effect when the division order was signed and the royalty payments were accepted.  The breach of the third lease concerned the nonpayment of royalties on production for an extended period of time due to a mistake concerning the location of the well; payments were mistakenly made to royalty owners on an adjoining tract where the well was believed to be located.  The court highlighted the facts that the mistake regarding the location of the well "was not positively established until 1958," three years after production began, and that "upon discovering the well was drilled on the wrong location recomputation was made of oil purchased by the initial purchaser . . . and efforts made to

recover royalties paid to interest holders in the [adjoining tract] because of the mistaken belief the well was located on that part of the tract." *Durkee*, 452 P.2d at 811.  Regarding Mr. Durkee, the court stated:  "Upon discovering oil was being produced from [his tract], Durkee learned oil was being purchased . . . and after inquiry executed a division order and received payment." *Id*. at 812. In upholding the trial court's refusal to cancel the three leases, the supreme court concluded that "Durkees' conduct clearly disclosed waiver of objection to the earlier transactions." *Id*. at 812-13.

The same cannot be said from the summary judgment record in this case.  Calhoon has presented sufficient facts, supported in the manner required by Rule 56, raising a genuine dispute regarding whether his execution of a division order and receipt of payment constituted a waiver of objection to the earlier transaction underlying his claim of invalidity of the Lease.

### Conclusion

For these reasons, the Court finds that the movants have not shown their entitlement to summary judgment on their claim for a declaration of validity of the Lease, or Calhoon's claim for a declaration of invalidity.

IT IS THEREFORE ORDERED that the Motion of Cimarex Energy Co. ("Cimarex") and QEP Energy Company ("QEP") for Summary Judgment [Doc. No. 47] is DENIED.

IT IS SO ORDERED this 14th day of August, 2013.


_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE